Abdul MAJID, Bashir Hameed,
Petitioners–Appellants,

v.

Leonard A. PORTUONDO, Robert
Kuhlmann, Respondents–
Appellees.

Docket No. 03–2608, 03–2610.

United States Court of Appeals,
Second Circuit.

Argued: Feb. 16, 2005.

Decided: Oct. 26, 2005.

Mark B. Gombiner, The Legal Aid Society, Federal Defender Division, Appeals Bureau, New York, NY, for Petitioners–Appellants.

John M. Castellano, Assistant District Attorney, Queens County (Richard A. Brown, District Attorney, Gary Fidel, Assistant District Attorney, of counsel), Kew Gardens, NY, for Respondents–Appellees.

Before: OAKES, KEARSE, and SACK, Circuit Judges.

SACK, Circuit Judge.

The petitioners, Abdul Majid and Bashir Hameed, appeal from a judgment dated August 7, 2003, of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*) denying their consolidated applications for writs of habeas corpus pursuant to 28 U.S.C. § 2254.[1] They claim that in a 1986 jury

1. 28 U.S.C. § 2254 calls such a document seeking habeas corpus relief an "application," but the parties, following common practice, *see, e.g., Walker v. Girdich*, 410 F.3d 120, 121 (2d Cir.2005), refer to it as a "petition." For the remainder of this opinion, so do we.

trial in New York Supreme Court, Queens County, which resulted in a judgment of conviction against each petitioner for second-degree murder, prosecutors utilized peremptory challenges of potential jurors in a racially discriminatory manner.

In a hearing conducted pursuant to the Supreme Court's decision in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), held approximately six-and-a-half years after the trial—presided over by a successor to the retired judge who had presided at trial—the parties were denied the opportunity to cross-examine the opposing parties' witnesses. The petitioners assert that their petitions should be granted because this procedure resulted in a decision that was contrary to Supreme Court law and based on an unreasonable determination of the facts. Alternatively, they contend that the state court proceeding deprived them of a full and fair hearing, and that the case should therefore be remanded for an evidentiary hearing.

We conclude that the state court's decision to deny the petitioners the opportunity to cross-examine their opponent's witnesses in the petitioners' *Batson* hearing was not contrary to or an unreasonable application of clearly established federal law and did not result in an unreasonable determination of the facts. We think that the procedures adopted by the trial court resulted in a full and fair hearing satisfying *Batson* 's guarantee of a meaningful inquiry. According the state court's factual findings, as sustained on direct appeal, the presumption of correctness to which they are entitled, we think that the court's conclusion that the defendants did not meet their burden of proving that the prosecution's race-neutral explanations were a pretext for purposeful discrimination was reasonable. Accordingly, we affirm the district court's denial of habeas corpus relief.

## BACKGROUND

Because the principal question before us is whether the petitioners were afforded a meaningful hearing satisfying the Supreme Court's requirements under *Batson* and its progeny, we describe those proceedings in considerable detail.

The petitioners, Abdul Majid and Bashir Hameed, members of the Black Panther Party,[2] were charged with the 1981 shooting in Queens County, New York, of two police officers, one whom died of his wounds. At the petitioners' initial trial in 1982, the jury returned a verdict of guilty on the charge of attempted murder as to the surviving officer, but was unable to reach a verdict as to the alleged murder of the officer who had died. In 1983, a second trial on the death of that officer again ended in a mistrial. A third trial was held in 1986 in Supreme Court, Queens County, Justice John Gallagher presiding. Assistant District Attorneys Gregory Lasak and James Quinn appeared for the prosecution. Lawyers Mark Gombiner (who also represents the petitioners on this appeal) and William Kunstler represented Hameed, and Randolph Scott–McLaughlin represented Majid.

---

**2.** Black Panther Party (BPP), a militant black political organization originally known as the Black Panther Party for Self–Defense. It was founded in Oakland, California, by Huey Newton and Bobby Seale in October 1966. Newton became the party's defense minister, and Seale its chairman. The BPP advocated black self-defense and restructuring American society to make it more politically, economically, and socially equal.

"Black Panther Party," Microsoft Encarta Online Encyclopedia (2005), http://encarta.msn.com/encyclopedia_761563992/Black_Panther_Party.html (last visited Oct. 25, 2005).

The jury in the third trial was selected from a venire consisting of fifteen African–Americans and thirty-six others. In the course of jury selection, the prosecution ultimately exercised peremptory challenges against twelve of the African–Americans and six of the others. The prosecution also exercised peremptory challenges against two African–American prospective alternate jurors. The resulting jury comprised three African–American, one Hispanic, and eight white jurors, and a group of four alternate jurors one of whom was African–American, one of whom was Hispanic, and two of whom were white.

After jury selection and on the day before opening statements, the Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Batson* held that when a state purposefully excludes jurors because of their race, it violates the Equal Protection Clause. *See id.* at 89, 106 S.Ct. 1712 ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."). On July 2, 1986, the defendants were convicted of murder in the second degree and sentenced to a term of imprisonment of twenty-five years to life.

On appeal, the Appellate Division initially affirmed the convictions. *People v. Hameed*, 178 A.D.2d 546, 577 N.Y.S.2d 456 (2d Dep't 1991). But the court later granted the defendants' motion for reargument. *People v. Hameed*, 183 A.D.2d 847, 584 N.Y.S.2d 94 (2d Dep't 1992). On reargument, the court concluded that the use of peremptory challenges to strike eighty percent of prospective black jurors was sufficient to establish an inference of purposeful discrimination. *Id.* at 848, 584

N.Y.S.2d at 95. Accordingly, the Appellate Division vacated its earlier affirmance and ordered an evidentiary hearing to consider any race-neutral reasons the prosecution might offer for its pattern of peremptory strikes. *Id.*, 584 N.Y.S.2d at 95.

On September 9, 1992, Supreme Court, Queens County, held a hearing to determine the procedures it would use for the *Batson* hearing ordered by the Appellate Division. Justice Gallagher having retired, Justice Ralph T. Sherman presided. The defendants argued that they should be allowed to review the prosecution's *voir dire* notes from the original trial. They also opposed the prosecution's motion to bar the cross-examination of witnesses. The defendants contended that to prevent them from cross-examining witnesses would be to foreclose a fair hearing and "make it absolutely impossible for the Court to evaluate the credibility of [the prosecutors]." Tr. of Proceedings before Hon. Ralph Sherman at 19, *People v. Hameed*, No. 1493–81 (N.Y.Sup.Ct. Sept. 9, 1992).

On September 16, 1992, Justice Sherman issued an order outlining the procedures he would employ at the *Batson* hearing. The order stated that "[t]he prosecutor's voir dire notes will not be given to defense counsel, but will be examined by the Court in camera." *People v. Hameed*, No. 1493–81, Order at 1 (N.Y.Sup.Ct. Sept. 16, 1992) (order to establish *Batson* hearing procedure). It further provided that the prosecution and defense witnesses would have the opportunity to testify, subject only to cross-questioning by the court. *See id.* at 2.

On September 24, 1992, the court conferenced with the parties. Defendant Hameed's attorney Gombiner again asserted his objection to the procedures Justice Sherman had instituted, arguing that "[they] deprive[] the defendants of a full

and fair hearing." Tr. of Proceedings before Hon. Ralph T. Sherman at 45–46, *People v. Hameed*, No. 1493–81 (N.Y.Sup. Ct. Sept. 24, 1992). Gombiner also argued that limiting review of the prosecution's *voir dire* notes to the court's *in camera* inspection was inadequate. Because the State had received Justice Sherman's order describing the hearing procedures only the day before and asserted that it was therefore unprepared to proceed, the court rescheduled the hearing to begin several weeks thereafter, on October 13, 1992.

The October 13 hearing began with the prosecution's direct examination of Assistant District Attorney ("ADA") Lasak, who, along with ADA Quinn, had prosecuted the case.[3] After providing some background information on the case, Lasak described the procedures governing jury selection in the 1986 trial, as well as the procedure employed by the court for jury selection. Lasak then described the rationale behind each of the fourteen peremptory challenges of African–American prospective jurors and prospective alternate jurors.

Lasak said that in the case of African–American prospective juror Mildred Jackson, "there were a number of factors" involved in the decision to peremptorily challenge her, Tr. of Proceedings before Hon. Ralph Sherman at 28, *People v. Hameed*, No. 1493–81 (N.Y.Sup.Ct. Oct. 13, 1992), including reasons unique to Jackson such as concerns about her willingness to convict on circumstantial evidence and her pending vacation plans. He also cited more general concerns, such as Jackson's religious devotion and her residence in South Ozone Park, where Majid lived.

With respect to Jackson's religious devotion, Lasak said that when the *voir dire* began, Majid and Hameed "were wearing

[k]ufis at the time which were Muslim religious headwear," and they "had a Koran bible [sic] in front of them." *Id.* at 30. According to Lasak, "I did not want [Jackson] relating to the defendants because of her religious belief[s]." *Id.* Lasak also noted that he thought that "[r]eligious people on the whole are very forgiving and I felt that they possibly could be unduly sympathetic to the defendants." *Id.* at 31. He stated his belief that "they may hold [the prosecution] to a higher standard than that of reasonable doubt due to their religious beliefs." *Id.*

With respect to Jackson's residence in South Ozone Park, Lasak noted that Majid and his family also lived in South Ozone Park. He expressed concern about Jackson's possible familiarity with and fear of the family. Lasak said that no single reason resulted in the exclusion of Jackson, but that "[i]t was a combination of all of those factors." *Id.* at 30.

Lasak then testified that African–American prospective juror Sylvia Marsett also had a combination of specific and general characteristics that led the prosecution to challenge her: She was an employee of Queens General Hospital, which triggered Lasak's concern that she (like others in medical-related professions) would be more open to a "cause of death issue" if the defense raised it. *Id.* at 32. Because Marsett worked at the hospital where the officer was treated, Lasak was concerned that she might know some of the people who might be called to testify about the cause of death, and he "didn't want anyone personally familiar with that aspect" of the case. *Id.* Lasak explained that the officer who eventually died clung to life for some "two and a half week[s]" after he was shot, and after being subjected to various medi-

---

3. In 1986, ADA Lasak had been Chief of the Homicide Bureau in the District Attorney's Office, to which ADA Quinn was also then assigned.

cal procedures, which made the prosecution vulnerable to the assertion that the officer died as a result of an intervening cause. *Id.* at 33. In addition, Marsett was active in volunteer work, which for Lasak "evince[d] a sympathetic mind and a caring person." *Id.* at 34. Further, at *voir dire,* upon questioning by the defense attorneys, Marsett had stated that her sister's son had been shot during a gas-station holdup and that that incident would affect her judgment, although she did not explain how it would affect her. Finally, Lasak noted that Marsett's sister lived near Majid's family in South Ozone Park.

With respect to the peremptory challenge of African–American prospective juror Dolores King, a New York City employee who dealt with building and heat violations for the Department of Code Enforcement, Lasak said that her occupation was cause for concern because Lasak "didn't want that type of nitpicking person to look at the evidence that we put forth and to be very picky about whether or not we met A, B, C and D to the extent that she would at her employment." *Id.* at 36. In addition, King lived in the Queensbridge Projects, where Majid's two brothers resided and were, Lasak testified, "known drug dealers." *Id.* Lasak again explained, "I did not want anybody [who feared Majid's family] seated on this jury who could possibly be afraid to convict the defendants of murder." *Id.* at 37.

After Lasak had described these first three peremptory challenges, Justice Sherman ordered the session adjourned so that he could review his notes on the examination thus far. After the break, Justice Sherman stated that he had "decided that it would be inappropriate at th[at] time . . . to attempt to ask questions." *Id.* at 39. He explained, "I don't think I would have sufficient information to ask questions of the witness . . . ." *Id.* He expressed the expectation that he would have more time to formulate questions after the completion of direct examination. Noting that counsel for both sides "have been living with this for the last six or seven years," he revised slightly the procedures adopted in his earlier order: "I would request [that] if . . . defense counsel wishes to submit to the Court any subjects, topics that they would deem appropriate for the Court to ask questions about," then they should do so. *Id.* at 39–40. With that, Justice Sherman allowed the prosecution to resume its direct examination.

Continuing his testimony, Lasak provided reasons similar to those he had described earlier for the striking of the remaining African–American prospective jurors and alternates—including technical or medical occupations that in Lasak's view might cause a juror to "hold [the prosecution] to a higher standard of proof than that of beyond a reasonable doubt," *id.* at 41, or to be more sympathetic to a "cause of death" defense, *id.* at 45; residence in South Ozone Park, which might result in the juror's fear of the defendants; and religious devotion suggesting a predisposition toward sympathy—as well as factors specific to individual prospective jurors and alternates, such as a purported inclination to exaggerate credentials in one case, and an apparent inability to establish a rapport with prosecutors or a contrasting ability to do so with defense attorneys in others.

Lasak also asserted that he had exercised peremptory challenges of prospective jurors who had similar backgrounds but who were not African–Americans. For example, with respect to technical occupations, Lasak noted that "on the subject of computers . . . we exercised a peremptory challenge against a prospective juror . . . who is non-black for the same reason [—]

because he too was involved in computers." *Id.* at 41. And Lasak noted that "there was a non-black [prospective] juror ... who [a defense attorney] during questioning developed the same good rapport with.... Based upon that, we exercised a peremptor[y] challenge against [him] just like we did against [three African–American prospective jurors]." *Id.* at 50–51.

Lasak acknowledged that some of the prospective jurors whom the prosecution had not peremptorily challenged "shared some similar characteristics with the individuals" whom they had peremptorily challenged. *Id.* at 63–64. He went on, however, to assert that a combination of factors led the prosecution not to challenge these jurors. For example, one juror—the eventual forelady, who was an African–American—had a son who had been convicted of a crime, but she had also been the victim of a robbery and "she was an older woman" whose "deceased brother was a World War II veteran and he was also a police officer who was injured in the line of duty." *Id.* at 65. Another juror who was eventually seated was an accountant, which Lasak acknowledged was a technical occupation for which he had expressed concern with respect to other jurors they had struck. That juror, however, had served on a jury ten times previously and therefore was a veteran who Lasak thought would "listen to the evidence," *id.* at 66, and not "be intimidated by any kind of shenanigans that are pulled in the courtroom," *id.* at 67. Another juror who was eventually seated lived in South Ozone Park but said he was unfamiliar with the area in which Majid's family lived. He also was a veteran juror, was older, had been the victim of a robbery, and "appeared ... to be very conservative." *Id.* at 69. Yet another juror was familiar with the crime scene and was religious, but was also a member of the Veterans of Foreign Wars, the Masons, and the Elks—factors

that the prosecution viewed positively and that it thought reduced the impact that religious involvement might have upon him in his role as a juror.

As to another juror, who "appeared to be religious" and "volunteered at an old age home," Lasak explained that he "really had no particular like for" her but decided to save his peremptory challenge in her case because he "felt one hundred percent sure [(although he turned out to be wrong)] that the defense was going to knock her off the jury" because he sensed antagonism between her and the defense counsel and "she made a statement to the effect that the reason she moved from [the neighborhood in which she had lived] was because black people were moving into the neighborhood." *Id.* at 73–74. Lasak said that he "was very surprised that [the defense] did not" challenge her. *Id.* at 74. The same calculus affected Lasak's decision not to challenge a juror with a technical background, with Lasak "fe[eling] that [the defense attorneys] were going to challenge him" for other reasons, even though they ultimately did not do so. *Id.* at 76–77.

At the close of the October 13 hearing, the court adjourned the proceedings until November 13, 1992, advising counsel that

the minutes will be supplied to defense counsel and to the Court ... within two to three weeks. That will give the Court sufficient time to review the notes that he received today from the District Attorneys on their selection, and also to go over the voir dire of each and every juror discussed again and prepare questions to be asked of the witness.

It will also give defense counsel time to submit to the Court such topics of questions that they deem proper for the Court's consideration to use in its questions to be asked.

*Id.* at 84. In light of the court's decision to allow the defense to submit "topics" for the court—which "could be in the form of questions that they think [Justice Sherman] should properly ask," although the presiding judge retained "the ultimate decision whether or not ... to ask those questions"—the prosecutors decided that they would voluntarily provide the defense with their original *voir dire* notes—the notes that Justice Sherman had earlier declined to order produced. *Id.* at 90–91.

On November 13, the parties reconvened, at which time the continuation of the hearing was rescheduled for November 25. Before adjourning on November 13, however, the court noted that it had not yet received any proposed questions from defense counsel. In response, Attorney Gombiner again voiced the view that if the defense did submit questions to the judge, the defendants would not "get the benefit of the adversary system." Tr. of Proceedings before Hon. Ralph Sherman at 4, *People v. Hameed,* No. 1493–81 (N.Y. Sup. Ct. Nov. 13, 1992). Describing cross-examination as "an art ... designed to probe the truth," Gombiner argued that the defendants "should not have to rely on the Court to do that job for [them]" and that it was improper for the court to force them to do so. *Id.* at 4–5. Gombiner also requested that they have the opportunity to call ADA Quinn as a hostile witness if the State was not going to conduct a direct examination of Quinn. The court denied Gombiner's request and adjourned.

On November 25, 1992, the defense reiterated its view that the court's decision to prohibit cross-examination would prevent a full and fair hearing and that the court's decision to allow submission of questions for the court to ask was not a sufficient remedy. They argued that the court would be unlikely to be neutral, that the court's questioning would therefore be in-adequate, and that they might "be waiving an appeal by submitting questions to the Court." Tr. of Proceedings before Hon. Ralph Sherman at 19, *People v. Hameed,* No. 1493–81 (N.Y.Sup.Ct. Nov. 25, 1992) (morning session).

Unmoved by the defense attorneys' objections, the court proceeded to question Lasak. The court began by asking about the physical layout of the trial courtroom. It then questioned Lasak about the sources on which he had drawn in testifying as to the non-discriminatory reasons he had given, to which Lasak replied that most of the reasons were found in his *voir dire* notes, and, if they did not appear there, were based on his recollections, the *voir dire* minutes, and the recollections and *voir dire* notes of ADA Quinn.

After a side-bar in which defense counsel again raised objections to the court's procedures, the court questioned Lasak about a particular juror who was seated after the prosecution declined to challenge her. The court noted that Lasak had earlier testified that the juror's favorite book was the Bible, but that her husband was a security guard, which had raised in Lasak's mind the possibility that the juror " 'could relate to the various police officers and detectives who would testify at [the] trial.' " *Id.* at 33 (quoting Tr. of Proceedings before Judge Sherman at 70, *People v. Hameed,* No. 1493–81 (N.Y.Sup.Ct. Oct. 13, 1992)). Lasak had testified that the most important factor to him was that " 'the defense challenged her for cause based upon what they perceive[d] to be a language problem and ... [he] felt that maybe by challenging her she may have been insulted.' " *Id.* at 33–34 (quoting Tr. of Proceedings before Judge Sherman at 70, *People v. Hameed,* No.1943–81 (N.Y. Sup.Ct. Oct 13, 1992)). In response to the court's request for elaboration as to why the juror may have felt insulted, Lasak

stated that the juror "was questioned ... as to whether she had a problem understanding the language," and was later brought to side bar and questioned again as to whether she had difficulty understanding English. *Id.* at 34. Lasak testified that during that questioning, one of the defense attorneys asked her something "to the effect that when you go around the City day to day ... do you have any problems understanding the people," *id.* at 34–35, and that Lasak "felt that the question caused her some embarrassment," *id.* at 35. Trial counsel for the defense had again asked if there was some other reason why she should not sit as a juror, and she answered "no." *Id.* Lasak had concluded that "she was embarrassed by the first question" and "it became apparent that [the defense counsel] did not want her on the jury." *Id.* at 36. Upon that explanation, the court then allowed the prosecution to close Lasak's testimony with a few questions on re-direct examination, although asked that the prosecution reserve any rebuttal testimony until after the defense had completed its own testimony.

Following the completion of Lasak's testimony, with the court prepared to hear testimony from defense trial counsel, Attorney Gombiner stated that it was not his "understanding ... that [defense counsel] would take the witness stand and go through the entire recorded voir dire" and that he "was not under the impression that [he] would have to get up on the witness stand" and point out inconsistencies in Lasak's testimony. *Id.* at 41. Gombiner argued, "I am not prepared to do that at this time." *Id.* The court asked, "Are you telling me, Counselor, that you do not want to take the stand and give sworn testimony concerning your position in this case?" *Id.* at 42. Gombiner answered that the defense did want to provide evidence but that they did not understand that to mean that they had to "comb through the record

of the voir dire minutes and find every contradiction and give sworn testimony indicating at what page that contradiction existed on." *Id.* at 42–45. Gombiner argued, "That's what you would do in a brief." *Id.* at 45. Co-counsel Kunstler also raised again the defense's objection to the denial of the opportunity to cross-examine. But the court pressed Gombiner, saying: "You have got [Lasak's] testimony, and all you have to do is get on the stand and testify, give us your side. You don't want to do that and that is your prerogative." *Id.* Gombiner answered, "Judge, I do not want to get on the witness stand and testify about matters that are in the record." *Id.* at 46. With that, the court allowed the prosecution to proceed with Lasak's rebuttal testimony.

Buttressing the reasons why the prosecution was concerned that prospective jurors might fear Majid's family, Lasak testified that during proceedings in 1982, "the defendants had many supporters in the courtroom" and that "[t]hese supporters heckled the witnesses and disrupted the proceedings." *Id.* at 48. Lasak asserted that the prosecutors "were concerned that persons in the audience who spotted people on the jury from Queensbridge or South Ozone Park ... would spot them and [the prosecutors] were concerned with their safety and with anybody trying to intimidate them." *Id.*

Lasak also expanded on earlier testimony in which he had stated that some answers given by an African–American juror, Patty McClellan, "disturbed" him. *Id.* at 49. Lasak explained that he had asked McClellan "if she would expect a witness to ... testify the same exact way each and every time" and that he expected her to answer "no." *Id.* at 49–50. However, "she said something to the effect that, I would tell it the way I saw it," worrying Lasak, particularly because some wit-

nesses in the case had given sworn testimony about the events at issue seven or eight times, such that the defense had been able, during the first trial, to point out various inconsistencies. *Id.* The prosecution did not want jurors "who would expect the witness to testify the exact same way every time." *Id.* at 49.

Finally, Lasak explained once again why the prospective jurors' religious backgrounds were particularly important in this case, stating that from the beginning, the defendants were introduced as Muslims, were wearing kufis, and had copies of the Koran on the table in front of them throughout the proceedings. Furthermore, in their opening arguments in the previous trial the defendants had stated that they "worked in some kind of breakfast program for children," which was held in churches. *Id.* at 52.

During the afternoon portion of the November 25 proceeding, ADA Quinn, who in the intervening years had become Executive Assistant District Attorney of Queens in charge of the Trial Division, took the stand. Quinn testified briefly about the jury selection process upon examination by his attorney and by the court. He testified that he took notes during the *voir dire*, and that after it was complete, he discussed each of the jurors with Lasak, but that Lasak made the final decision on the peremptory challenges. He said that from his perspective "[r]ace played no part in our decision to peremptorily challenge any jurors or not to peremptorily challenge a juror." Tr. of Proceedings before Hon. Ralph Sherman at 6, *People v. Hameed*, No. 1493–81 (N.Y.Sup.Ct. Nov. 25, 1992) (afternoon session).

The court briefly questioned Quinn, in response to which Quinn noted that "[o]n occasion there were jurors who were not very responsive to Mr. La[s]ak, who were very responsive to defense counsel" and

that he "would bring that to [Lasak's] attention if he missed it." *Id.* at 7–8. He also informed Lasak when jurors made suggestive facial expressions while Lasak was not questioning them. Quinn testified that the reasons that Lasak had provided for the challenges were consistent with Quinn's own recollections.

After questioning Quinn, the court asked whether the defense attorneys had any questions they would like to submit to the court. Again, they declined the invitation. The court then adjourned the proceedings until December 10, 1992, at which time the defense would begin presentation of its case.

The defense case consisted of the testimony of Rose LaBorde, Majid's mother, and Gombiner. LaBorde contested Lasak's testimony that her family was feared in South Ozone Park. She said that none of her children lived with her there in 1986, at the time of the trial. On examination by Justice Sherman, LaBorde acknowledged that the LaBordes "were living [in South Ozone Park] a long time," and that her sons had gotten into trouble. Tr. of Proceedings before Hon. Ralph T. Sherman at 8–9, *People v. Hameed*, No. 1493–81 (N.Y.Sup.Ct. Dec. 10, 1992). She stated, however, that all her sons had moved out of the neighborhood by 1976, long before the trial. She testified that "[n]o one feared any of the LaBordes in South Ozone. The only thing the LaBordes ever did for anyone in South Ozone was to help them if they could." *Id.* at 11.

Gombiner testified that race permeated the trial; that the prosecution was at the time of trial unwilling to state reasons for each peremptory challenge of a prospective African–American juror; and that in their appeal brief in the 1986 trial, the prosecutors had provided some explanations for why they had peremptorily challenged various black jurors but that some

of those explanations were suspiciously absent from their explanations at the *Batson* hearing. *Id.* at 17–18. Gombiner also attempted to undermine some of the explanations given by the prosecutors for their challenges on the basis of the prospective jurors' medical expertise or religious affiliations, beliefs or practices. Specifically, Gombiner testified that there was never any issue as to whether a murder had been committed in this case, seeking to cast doubt on Lasak's testimony that he wanted to excuse certain jurors because of their medical backgrounds and potential sympathy to a "cause of death" defense. The defendants' case, Gombiner testified, was limited to "fabrication" and "misidentification." *Id.* at 21. Gombiner also contested Lasak's assertion that particularly religious jurors would be likely to feel an affinity toward the defendants.

Gombiner testified further that the only reason the defense had called the jurors' attentions to the defendants' kufis was that "we didn't want them to indicate they were being disrespectful for wearing hats in the courtroom" and "because we feared that certain jurors might be prejudiced against them because of their religion." *Id.* at 25. Gombiner also pointed out that, at trial, the prosecution had not mentioned any problems relating to Majid's family or its reputation, requested any protective orders in that regard, or asked any of the jurors whether they knew or feared Majid's family.

The court again adjourned the proceedings so that the prosecution could submit proposed questions for cross-examination. On January 13, 1993, the court resumed its examination of the defense witnesses, drawing its questions from a list submitted by the prosecution. Noting that some of the proposed questions the prosecution had submitted to be asked of Majid's mother, Rose LaBorde, were, in the court's view, irrelevant, the court proceeded to ask a subset of the questions the prosecution had proposed. The questions were apparently designed by the prosecution to attempt to establish that Majid's family did have continuing ties to South Ozone Park, contrary to LaBorde's testimony.

During Gombiner's testimony, in response to the court's questions, he acknowledged that the prosecution was not required in its original appellate brief to state the reasons for its peremptory challenges. In that light, guided by the prosecution's proposed questions, Justice Sherman also attempted, among other things, to elicit testimony from Gombiner establishing that a "cause of death" defense was available, which would lend credibility to the prosecution's testimony about its concerns about jurors with medical backgrounds. He asked whether Gombiner was aware that the medical examiner who conducted the autopsy on one of the police officers was, at the time of the autopsy, under investigation for "running a shoddy Medical Examiner's office" and "was criticized for the handling of several cases," which would make a "cause of death" defense more convincing. Tr. of Proceedings before Hon. Ralph Sherman at 34, *People v. Hameed,* No. 1493–81 (N.Y.Sup.Ct. Jan. 13, 1993). Asked whether, in light of these problems the defense counsel told the prosecution "that [they were] not going to contest any cause of death," Gombiner answered that, "[i]n essence, we did during the voir dire, because we conceded in their questions to the jury that it was a murder." *Id.* at 36. He acknowledged, however, that the defense had not said so directly. *Id.* at 36.

The defense testimony was followed by additional rebuttal testimony from Lasak and from Stanley Carpenter, who was a detective with the Police Department at

the time of the investigation into the 1981 shooting. Lasak testified that he learned that Majid's family was feared in South Ozone Park from various discussions with detectives on the case. He acknowledged that during the *voir dire,* he did not probe whether jurors in fact feared Majid's family, but explained that his "interest was to minimize the issue of fear" and "not . . . to highlight it." *Id.* at 63. Lasak also explained that although he originally attempted to convince the defense that a prospective juror should be excused for cause, his purpose was to try to avoid exercising, and thereby to save, a peremptory challenge. When his attempt failed, Lasak exercised a peremptory challenge. Lasak also stated that the medical examiner testified at trial and that, at the time of the trial, the examiner was under investigation for his and his office's conduct in approximately ten cases relating to the deaths of individuals in police custody. When Lasak's examination was completed, the court asked defense counsel again if they had any questions they would like to submit to the court to ask Lasak. The defense again declined.

Carpenter then took the stand. He testified that in 1981 he was a member of the Queens Homicide Squad, which was assigned to investigate the murders. According to Carpenter, the Police Department interviewed "hundreds of people" and learned that Majid and his brothers, who had become suspects with respect to the crime in question, were "well-known" in the community, making people reluctant to cooperate with the investigation. *Id.* at 79–80. Carpenter testified that "there was a definite fear on the part of the community." *Id.* at 80. He went on to note that he "had on many occasion[s] sat down with Mr. Lasak and Mr. Quinn and discussed the aspects of the investigation; all the details and who cooperated, who didn't," *id.* at 81, and that the prosecutors were

therefore aware of Majid's family's reputation as Carpenter had described it in his testimony.

The defendants did submit five written questions to be asked of Carpenter, which the court asked.

On March 17, 1993, after the *Batson* hearing had concluded, the defendants submitted a memorandum of law and fact analyzing the hearing testimony. In it, they attempted to undermine the non-discriminatory reasons Lasak had provided by arguing that those reasons were implausible or were unsupported by the record, and by pointing out alleged inconsistencies in the treatment of African–American and other prospective jurors. The State submitted its answering memorandum on April 26, 1993, and the defendants responded with a reply memorandum on June 3, 1993. The State filed a reply memorandum on June 17, 1993.

On November 10, 1993, in a detailed written opinion, Justice Sherman found that Lasak had testified in a "straightforward and non-evasive" manner and concluded that "the substance of Mr. Lasak's testimony was pla[u]sible." *People v. Hameed,* No. 1493–81, slip op. at 65 (N.Y.Sup.Ct. Nov. 10, 1993). He further concluded that Lasak had supplied credible, race-neutral reasons for his peremptory challenges, and therefore had successfully rebutted the defendants' allegations. On appeal, in a brief opinion, the Appellate Division "f[ou]nd no basis . . . to interfere with the trial court's determination," and re-affirmed the judgments. *People v. Hameed,* 212 A.D.2d 728, 729, 622 N.Y.S.2d 811, 812 (2d Dep't 1995).

Permission to appeal to the New York Court of Appeals was granted. *People v. Hameed,* 86 N.Y.2d 736, 655 N.E.2d 713, 631 N.Y.S.2d 616 (1995). In an opinion by Judge Bellacosa, the court affirmed. *Peo-*

ple v. Hameed, 88 N.Y.2d 232, 666 N.E.2d 1339, 644 N.Y.S.2d 466 (1996), cert. denied, 519 U.S. 1065, 117 S.Ct. 704, 136 L.Ed.2d 625 (1997). It rejected the defendants' assertion that the denial of cross-examination rendered the Batson hearing fatally flawed, concluding that "the actual conduct of the [Batson] inquiry has been placed within the sound discretion and molding of the trial courts," and that cross-examination in Batson hearings is not required by the Confrontation Clause. Id. at 236–39, 644 N.Y.S.2d 466, 666 N.E.2d 1339, 666 N.E.2d at 1341–43, 644 N.Y.S.2d at 468–70. The Court of Appeals observed that "the major doctrinal conflict in this area is not about allowing cross-examination .... Rather, the tension is between those courts that recommend an adversary proceeding of some type and those that permit the prosecutor's explanation to be received in camera and ex parte." Id. at 237–38, 666 N.E.2d at 1342, 644 N.Y.S.2d at 469 (internal quotation marks, alteration, and citation omitted).

Noting that it "ha[d] already resolved the question in favor of an open court exchange between the competing camps," id. at 238, 666 N.E.2d at 1342, 644 N.Y.S.2d at 469, the Court of Appeals concluded: "We perceive no sound or compelling reason to impose new, stringent, procedural requirements for Batson hearings, whether they are held before trial or, as here, after trial." Id. The court explained that prosecutors have an "unqualified duty of scrupulous candor ...," id. (internal quotation marks and citation omitted), and that courts "should thus be entitled to rely on the prosecutors' open court, on the record representations," id. It further concluded that the argument that the defendants' right to confront witnesses was violated "finds no support in any authorit[y]." Id. at 239, 644 N.Y.S.2d 466, 666 N.E.2d 1339, 666 N.E.2d at 1343, 644 N.Y.S.2d at 470. Because the right to confrontation is a trial right, and in this case the prosecutors "were not testifying as witnesses 'against' the defendants, but were instead explaining and justifying their own professional conduct, undertaken previously at a pretrial proceeding," the court rejected the defendants' claim. Id. (emphasis in original).

On January 6, 1997, the United States Supreme Court denied the defendants' petition for a writ of certiorari. Hameed v. New York, 519 U.S. 1065, 117 S.Ct. 704, 136 L.Ed.2d 625 (1997).

In December 1997, the defendants each filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York. The petitions were consolidated on April 22, 1998. In their consolidated petitions, the defendants argued that (1) the prosecutors' use of peremptory challenges violated their Fourteenth Amendment right to equal protection, and (2) the hearing court's refusal to allow them to cross-examine the prosecution witnesses violated their Fourteenth Amendment due process right and their Sixth Amendment right to confrontation as applied to the states through the Fourteenth Amendment.

On August 7, 2003, after oral argument, the district court denied the consolidated petitions, concluding that "[a]fter a close study of the record it is this court's de novo finding that the claims [are] not valid, but they are close to frivolous." Majid v. Portuondo, Nos. 97–CV–7536 (JBW), 98–CV–0019 (JBW), 03–MISC–0066 (JBW), slip op. at 5 (E.D.N.Y. Aug. 7, 2003). The court reviewed the race-neutral explanations provided by the prosecution for each of the fourteen peremptory strikes of prospective African–American jurors, and the prosecutors' explanations for why they did not challenge a variety of other jurors, including some that appeared similarly sit-

uated. The court noted that although "many of the reasons given by the prosecut[ion] may seem trivial or contrived, [the] selection of juries is notably a matter of art in which [an] intuitive lawyer's choices of who might be amenable or hostile are often critical to [the] outcome" and "some room for emotion and intuition by the lawyer remains." *Id.* at 13.

As for whether the denial of the defendants' ability to cross-examine witnesses during the *Batson* hearing justified relief, the district court concluded that "there is no clearly established federal law, as determined by the Supreme Court, establishing the right of a defendant to a trial-type cross-examination of the prosecutor in a *Batson* hearing." *Id.* at 11–12. Furthermore, the court concluded that the hearing's "quasi-inquisitorial approach . . . provided a full, fair and adequate procedure for determining the facts," *id.* at 18, and produced what a state trial judge could reasonably find was the correct result, *id.* at 21. The court issued a certificate of appealability on the date it denied the petitions.

The petitioners appeal.

## DISCUSSION

### I. Standard of Review

■ We review the district court's denial of the petitioners' habeas corpus petitions *de novo. McKinney v. Artuz,* 326 F.3d 87, 95 (2d Cir.2003).

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA),

> [a]n application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim [ ] resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Feder-

al law, as determined by the Supreme Court of the United States; or [ ] resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). In habeas proceedings, "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1).

Our review is thus confined to the question whether the conclusion of the New York courts as to the sufficiency of the state *Batson* hearing was contrary to, or involved an unreasonable application of, clearly established Supreme Court case law, or whether the adjudication of the petitioners' rights in the New York courts was based on an unreasonable determination of the facts in light of the evidence presented.

### II. The Absence of Cross–Examination at the *Batson* Hearing

In its landmark opinion in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court "reaffirm[ed] the principle" that "a 'State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause.'" *Id.* at 84, 106 S.Ct. 1712 (quoting *Swain v. Alabama,* 380 U.S. 202, 203–04, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)). The Court concluded that

> [t]he harm from discriminatory jury selection extends beyond that inflicted on the defendant and the excluded juror to touch the entire community. Selection procedures that purposefully exclude black persons from juries undermine public confidence in the fairness of our

system of justice. Discrimination within the judicial system is most pernicious because it is a stimulant to that race prejudice which is an impediment to securing to black citizens that equal justice which the law aims to secure to all others. *Id.* at 87–88, 106 S.Ct. 1712 (citations, internal quotation marks, and brackets omitted).

■ The *Batson* Court held that a defendant who "is a member of a cognizable racial group," *id.* at 96, 106 S.Ct. 1712, and who challenges the racial composition of a jury, no longer was required to show "that in the particular jurisdiction members of his race have not been summoned for jury service over an extended period of time," *id.* at 94, 106 S.Ct. 1712. "A single invidiously discriminatory governmental act is not immunized by the absence of such discrimination in the making of other comparable decisions." *Id.* at 95, 106 S.Ct. 1712 (internal quotation marks and citation omitted). "[A] defendant may make a prima facie showing of purposeful racial discrimination in selection of the venire by relying solely on the facts concerning its selection in his case." *Id.* (emphasis deleted).

■ In recognition of the danger of race-based jury selection in a particular trial, the Court mandated a three-step burden-shifting framework for determining whether the prosecution exercised its peremptory challenges on the basis of race. Under this framework, a defendant must first establish a *prima facie* case of racial bias. *Id.* at 96–97, 106 S.Ct. 1712. If he or she succeeds in doing so, the prosecution must then offer a race-neutral explanation for its challenge to the jurors in question. *Id.* at 97, 106 S.Ct. 1712; *see also Purkett v. Elem,* 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Even if the reasons the prosecution provides are neither "persuasive, [n]or even plausible," as

long as those reasons are facially valid, the burden will then switch to the defendant to prove that the reasons the prosecution gave are a pretext for purposeful discrimination. *Id.* at 767–68, 115 S.Ct. 1769. At that point, the determination "largely will turn on [the court's] evaluation of credibility," *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712, and, therefore, "the best evidence often will be the demeanor of the attorney who exercises the challenge," *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991).

While mandating that there be such an inquiry in cases in which there is an allegation of racial discrimination in jury selection, the Supreme Court has explicitly declined to prescribe specific procedures for the conduct of such an inquiry. *See Batson,* 476 U.S. at 99 n. 24, 106 S.Ct. 1712 ("[W]e make no attempt to instruct these courts how best to implement our holding today."); *Edmonson v. Leesville Concrete Co.,* 500 U.S. 614, 631, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991) ("[W]e leave it to the trial courts in the first instance to develop evidentiary rules for implementing our decision."); *Powers v. Ohio,* 499 U.S. 400, 416, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) ("It remains for the trial courts to develop rules ... to permit legitimate and well-founded objections to the use of peremptory challenges as a mask for race prejudice.").

The petitioners have not pointed us to, and our own research has not disclosed, any Supreme Court case law suggesting that an individual has a right to cross-examination in a *Batson* hearing, either as a result of the Confrontation Clause of the Sixth Amendment as applied to the States through the Fourteenth Amendment, or to fulfill *Batson*'s requirement of a "meaningful inquiry," *Jordan v. Lefevre,* 206 F.3d 196, 201 (2d Cir.2000). Neither is there clearly established Supreme Court

precedent to support the petitioners' contention that "once [Lasak] was permitted to give direct testimony, cross-examination, not some substitute procedure, was *the* constitutionally acceptable method for assessing his believability." Petitioners–Appellants' Reply Br. at 7.

The cases that specifically consider the role of cross-examination in *Batson* hearings support our reading of the relevant Supreme Court precedents. *See United States v. Jiminez,* 983 F.2d 1020, 1023–24 (11th Cir.) (upholding a *Batson* hearing in which the defense counsel was denied an opportunity to cross-examine the prosecutor after the prosecutor provided race-neutral explanations for his challenges and concluding that, "[g]iven the court's need to observe judicial economy, it was not an abuse of discretion to decline to conduct a mini-trial on the credibility of the prosecutor in this case"), *cert. denied,* 510 U.S. 925, 114 S.Ct. 330 (1993); *United States v. Tindle,* 860 F.2d 125, 130–31 (4th Cir.1988) (considering a claim "that a *Batson* inquiry requires an evidentiary hearing at which [the defendant] would be allowed to call witnesses, and to cross-examine the prosecutors" and concluding: "There is no absolute right to an evidentiary hearing ... [and][t]here was no abuse of discretion in the district court's refusal to conduct an evidentiary hearing in this case. *Batson* does not require a trial within a trial, and purposely left to lower courts the method of conducting inquiries into *Batson*-type claims."), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1038 (1989); *United States v. Garrison,* 849 F.2d 103, 106 (4th Cir.) ("[Defendant's] insistence on an evidentiary hearing in which prosecutors and defense attorneys and possibly other witnesses would be examined and cross-examined misconceives the *Batson* inquiry. Although a district court could conduct such a hearing if it believed circumstances warranted it, *Batson* does not require this

intrusion on the trial proceedings."), *cert. denied,* 488 U.S. 996, 109 S.Ct. 566, 102 L.Ed.2d 591 (1988); *Kelly v. Withrow,* 822 F.Supp. 416, 423 (W.D.Mich.1993) ("Even where a [*Batson* ] hearing is necessary ... the extent of the hearing remains discretionary with the trial judge. Whether to hold an evidentiary hearing in which witnesses are examined and cross-examined is left to the judgment of the trial court."), *aff'd,* 25 F.3d 363 (6th Cir.), *cert. denied,* 513 U.S. 1061, 115 S.Ct. 674, 130 L.Ed.2d 607 (1994); *see also Gray v. State,* 317 Md. 250, 562 A.2d 1278, 1281 (1989) (noting that "[t]he defendant has not referred us to a case, nor have we found one, in which an appellate court has held that the defendant has an absolute right to require that a prosecutor be placed under oath and be subjected to cross-examination in every *Batson* proceeding" and that "[t]he majority of courts ... recognize the broad variety of circumstances under which the need to have the prosecutor explain his challenges may arise, and properly afford to the trial judge broad discretion to determine how the inquiries will be conducted").

We think that underlying both the rule that cross-examination is not required and the decision of the trial court in this case not to permit it, is likely the fact that *Batson* hearings are typically conducted in association with, and at the same time as, jury selection. Subjecting the prosecutor to cross-examination, or indeed ordering him or her to turn over contemporaneous notes regarding jury selection, at that stage of the proceedings (rather than, as here, many years thereafter) might prove to be, at best, both inconvenient and intrusive—in addition to being unnecessary for an adequate evaluation of the prosecutor's explanations.

It is worth noting in this context that not only is there no requirement established in the case law of cross-examination

at a *Batson* hearing, but there also remains doubt whether the defense enjoys the even more rudimentary right· to be allowed access to the prosecution's race-neutral explanations in the first place. It remains at least arguable that courts holding *Batson* hearings may, to the contrary, hear the explanations *in camera* and outside the presence of the defendants. *See, e.g., Garrison,* 849 F.2d at 106–07 (upholding a *Batson* hearing in which a court conducted an *ex parte* examination of a prosecutor's *voir dire* notes, while stating that, in general, "if the court decides to consider any notes, other documents, or statements pertaining to the prosecutor's explanation, we, like the Seventh Circuit, counsel that a trial court should *ordinarily* conduct adversary, rather than *ex parte,* proceedings" (emphasis added)); *United States v. Tucker,* 836 F.2d 334, 338–40 (7th Cir.) (considering the question "whether *Batson* allows a court to hear the prosecution's reasons for excusing black venirepersons in camera and out of the presence of the defendants" and concluding, *inter alia,* that "*Batson* neither requires rebuttal of the government's reasons by the defense, nor does it forbid a district court to hold an adversarial hearing"), *cert. denied sub nom. Bell v. United States,* 488 U.S. 855, 109 S.Ct. 143, 102 L.Ed.2d 115 (1988), *and cert. denied,* 490 U.S. 1105, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989); *United States v. Davis,* 809 F.2d 1194, 1201 (6th Cir.) (concluding that "the record ... simply does not indicate a situation where the presence of the defendants and their defense counsel was required to ensure fundamental fairness" in a *Batson* hearing conducted *in camera,* where the defendants were able to voice their· objections before and after the proceeding), *cert. denied,* 483 U.S. 1007 (1987), *and cert. denied,* 483 U.S. 1008 (1987).

■ Cross-examination of witnesses during the course of a criminal trial is, of course, a right guaranteed to the defendant by the Confrontation Clause. U.S. Const. amend. VI; *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965); *see also Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) ("The main and essential purpose of confrontation is to secure for the opponent the opportunity of cross-examination." (internal quotation marks and citation. omitted)). "[P]robably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case." *Pointer,* 380 U.S. at 404, 85 S.Ct. 1065; *see also United States v. Oliver,* 626 F.2d 254, 262 (2d Cir.1980) (quoting *Pointer* ). It is therefore not surprising that we have, on occasion, emphasized the utility of cross-examination in *Batson* hearings. We do so again today.

In *Bryant v. Speckard,* 131 F.3d 1076 (2d Cir.1997), *cert. denied,* 524 U.S. 907, 118 S.Ct. 2066, 141 L.Ed.2d 143 (1998), for example, we upheld the validity of a *Batson* inquiry, noting approvingly that after the prosecutor testified, "the defendant had a full opportunity to cross-examine him." *Id.* at 1078. In *Jordan v. Lefevre,* we rejected the adequacy of a hearing that we deemed not to provide a "meaningful inquiry into the question of discrimination," noting, in reference to the hearing procedure in *Speckard,* that "[w]e have upheld a trial court's determination that race neutral reasons were not pretextual where the trial court reconstructed the *voir dire* at a hearing based only upon the prosecutor's testimony under cross-examination by defense counsel." 206 F.3d at 201. And in *United States v. Biaggi,* 853 F.2d 89 (2d Cir.1988), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1312, 103 L.Ed.2d 581 (1989), we held that a *Batson* hearing in the district court was adequate, observing

that the prosecutors were subjected to " 'vigorous and dogged' cross-examination by defense counsel" in the district court, *id.* at 96. But we did not indicate that the absence of cross-examination would have rendered the inquiry inadequate. In no case in which we have emphasized the value of cross-examination, then, have we also suggested that in the absence of cross-examination a hearing is necessarily infirm.

■ To be sure, the petitioners correctly point out that the cases stating that *Batson* inquiries need not include a right to cross-examination generally did not involve hearings where the court allowed the prosecutor the opportunity to provide testimony through direct examination. It does not follow, however, that where the prosecutor does so, the right to cross-examine necessarily arises. Nothing about the circumstances of this case indicates the need for such a rule. The defendants here had the benefit of a lengthy hearing in which they had the opportunity to hear the prosecutors' detailed explanations for their peremptory challenges, to examine the prosecutors' contemporaneous notes relating to jury selection, to participate, if indirectly, in the court's examination of the prosecution's witnesses, and to present testimony and other evidence of their own.[4]

We conclude that the fact that there was no adversarial cross-examination, alone, does not render the otherwise full and fair hearing in the state trial court inadequate.

■ The petitioners are left, then, with the broad assertion that the *Batson* hearing was conducted in a manner that was contrary to the Supreme Court's requirement that such hearings "permit legitimate and well-founded objections to the use of peremptory challenges as a mask for race prejudice." *Powers,* 499 U.S. at 416, 111 S.Ct. 1364. Reviewing the record of the *Batson* hearing here, especially in light of the repeated opportunity that Justice Sherman gave to the defendants to have input into the process by which questions were asked of prosecution witnesses, we think it plain, as we have already noted, that the proceedings were both ample and fair. *Batson*'s "meaningful inquiry" requirement, *Jordan,* 206 F.3d at 201, was easily satisfied.

In applying the Supreme Court decisions that confer discretion on trial courts to develop *Batson* procedures, we and our sister circuits have set the bar for the adequacy of such procedures considerably lower than that cleared by the New York Supreme Court in this case. *Cf., e.g., Brown v. Kelly,* 973 F.2d 116, 121 (2d Cir.1992) (affirming the judgment of the district court based on a *Batson* hearing in the district court in which the judge heard testimony from the prosecutor six years after the original trial and "had no oppor-

---

4. Concern has been expressed—although any such concern on our part would not be relevant to our AEDPA analysis—whether it might be counterproductive to conclude that if a court decides in a *Batson* hearing to allow the direct examination of witnesses in open court, it is then required to provide an opportunity for their cross-examination by the opposing party. The New York Court of Appeals, in its *Hameed* decision, said:

The hearing court should not be faulted for taking extra measures, nor should it now be found to have lapsed into error for

not having gone even further. This is especially so since the hearing court was not constitutionally or otherwise required to have taken even the first extra precaution. It makes no sense to adopt such an unwise development and disincentive against trial courts structuring *Batson* hearings and exercising their discretion in favor of additional measures suitable to a particular case and circumstances.

*People v. Hameed,* 88 N.Y.2d at 239, 666 N.E.2d at 1343, 644 N.Y.S.2d at 470.

tunity independently to evaluate the demeanor of the subject venirepersons"), *cert. denied,* 506 U.S. 1084, 113 S.Ct. 1060, 122 L.Ed.2d 366 (1993); *Lewis v. Lewis,* 321 F.3d 824, 831 & n. 27 (9th Cir.2003) (stating that "[a] court may enlist the help of counsel in order to evaluate 'the totality of the relevant facts' " at the third stage of the *Batson* inquiry, and noting that "requiring a court to allow defense counsel to argue is not clearly established law," but concluding that "[n]onetheless, it seems wise for courts to allow counsel to argue, if only to remove some of the burden of record evaluation from the court"); *Hollingsworth v. Burton,* 30 F.3d 109, 113 n. 5 (11th Cir.1994) (holding that the lead prosecutor need not testify at a *Batson* hearing), *cert. denied,* 513 U.S. 1131, 115 S.Ct. 944, 130 L.Ed.2d 888 (1995); *United States v. Roan Eagle,* 867 F.2d 436, 441 (8th Cir.) (noting that "[t]he nature of the [*Batson*] inquiry, although adversarial, does not rise to the level of a mini-trial" and stating that, although "once the prosecutor has advanced his racially neutral explanation, the defendant should have the opportunity to rebut with his own interpretation," "[t]his ... need not necessarily be a lengthy process"), *cert. denied,* 490 U.S. 1028, 109 S.Ct. 1764, 104 L.Ed.2d 199 (1989); *United States v. Thompson,* 827 F.2d 1254, 1258–60 (9th Cir.1987) (noting that it "would be surpris[ing] ... if [adversarial *Batson*] proceedings were to involve anything more elaborate than the prosecutor's articulation of his reasons, followed by the argument of defense counsel pointing out why the articulated reasons are factually unfounded or legally insufficient").

We conclude that the New York court's "adjudication of the [*Batson*] claim" did not "result[ ] in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

## III. The State Court's Credibility Findings

The petitioners also argue that the state court's factual findings were not entitled to a presumption of correctness because they were based on a flawed proceeding,[5] and were in fact unreasonable. For the reasons adverted to in our discussion of the prohibition against cross-examination at the *Batson* hearing, we find no support for that assertion in the record.

According Justice Sherman's factual findings their deserved presumption of correctness, then, we evaluate whether the petitioners have rebutted that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). That standard "is demanding but not insatiable." *Miller–El v. Dretke,* —— U.S. ——, ——, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005) ("*Miller–El II* "). "Deference does not by definition preclude relief." *Miller–El v. Cockrell,* 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("*Miller–El I* "). In this case there is little evidence, certainly not amounting to the "clear and

---

5. In connection with this argument, the petitioners cite, *inter alia, Bulger v. McClay,* 575 F.2d 407 (2d Cir.), *cert. denied sub nom. Ward v. Bulger,* 439 U.S. 915, 99 S.Ct. 290, 58 L.Ed.2d 263 (1978). We did there conclude that a hearing in which a judge did not allow cross-examination of a witness during a post-trial hearing on whether the jurors considered non-record information was not a full

and fair hearing. *Id.* at 410–11. But that case, where the issue was whether the jury had considered extraneous evidence in convicting the defendant, does not stand for the proposition that cross-examination is the *sine qua non* of a full and fair hearing. The lack of cross-examination "only exacerbated the inadequacies of [the court's] own examination." *Id.* at 410.

convincing" evidence required, that Justice Sherman's finding that the petitioners did not establish that the respondents' race-neutral reasons were a pretext for purposeful discrimination was incorrect.

Although the petitioners are correct that the statistical profile of jury selection in this case, with twelve of fifteen African–American prospective jurors dismissed, is not dissimilar from that in *Miller–El II,* where ten of eleven African–American prospective jurors were dismissed peremptorily, *see Miller–El II,* 125 S.Ct. at 2339, the *Miller–El* decisions do not help the petitioners here. In *Miller–El II,* in which the Supreme Court ordered habeas relief based on the petitioner's *Batson* claim, the prosecution failed to provide plausible, race-neutral explanations for its decisions to peremptorily challenge various prospective jurors and not to challenge others. *Id.* at 2340. Neither is there evidence in this case of "broader patterns of [discriminatory] practice" like those found in *Miller–El II,* which included evidence of "jury shuffling"—*i.e.,* "rearranging the order in which members of a venire panel are seated," in order to reduce the number of black jurors—evidence of discriminatory questioning, and "widely known evidence of the general policy of the ... District Attorney's Office to exclude black venire members from juries." *Id.* at 2332. There, the Supreme Court concluded that "when [the] evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination" so that the state court's conclusion was "wrong to a clear and convincing degree"—"unreasonable as well as erroneous." *Id.* at 2339–40.

Here, Lasak's race-neutral explanations were plausible. The presence of the various factors Lasak pointed to could have raised prosecution concerns about the degree of sympathy that the prospective ju-

rors might feel for the defendants, the skepticism with which they might view the prosecution's case, and any other hesitation they might harbor about rendering a verdict adverse to the defendants.

■ Examining Lasak's explanations and extending the requisite deference to Justice Sherman's evaluation of Lasak's credibility and that of Majid's mother and Attorney Gombiner, while we may disagree with some of the inferences the prosecution relied on in reaching its decisions whether to exercise a peremptory strike, we conclude that Justice Sherman's determination, sustained on direct appeal, was not an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). On this record, we cannot conclude as the Supreme Court did in *Miller–El II* that "[t]he prosecutors' chosen race-neutral reasons for the strikes do not hold up and are so far at odds with the evidence that pretext is the fair conclusion." 125 S.Ct. at 2339. To the contrary, we think that the court was acting reasonably in deciding that the prosecutors' explanations credibly explained the prosecution's choice of peremptory strikes with plausible non-discriminatory reasons.

Because we conclude that the petitioners were afforded a full and fair *Batson* hearing in state court, it follows that additional evidentiary hearings in federal court are unnecessary.

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.